The first case this morning is Case No. 414-0821, entitled In Re. O.K. People Be Kidding Me. For the appellate, we have Jeffrey Kramer of the Anthony Daly Mansion. Mr. Kramer, are you ready? Yes, Your Honor. Please proceed. May it please the Court. Counsel? I am Jeffrey Kramer, attorney for the petitioner in this matter, respondent Mother Teresa Kennedy. The minor child at issue in this case, O.K., was neither abused, neglected, nor at demonstrated risk of harm to himself. Nonetheless, an unjust result was reached by inappropriately applying the injurious environment standard to mechanically skip from a tragic but one-time injury to one child to an effectively automatic presumption that every other child in the household was also neglected. Moreover, this was followed by subsequent findings of unfitness and removal from an innocent parent in contradiction of the specifics and the totality of the facts in this case. This precedent would encourage a system whereby the circumstances surrounding the actual child at issue at the times of the relevant hearings are effectively ignored. Your Honors, in essence, this case presents absolute parental liability. As our briefs discuss, there are three specific points at which the trial court acted in contravention of the manifest way of the evidence. The first of those was the finding of neglect at the adjudicatory hearing. The second was a finding of unfitness at the dispositional hearing. And the third was a finding that removal was in the best interests of the minor child, O.K., and that directly supervised visitation was an appropriate remedy. As to the first of these, neglect at the adjudicatory. The trial court proceeded based on evidence in the record. The evidence in the record shows no risk of harm to O.K. himself. There's no... Counsel, a foster child in the home was basically killed by O.K.'s father, correct? Yes, Your Honor. And so, at the adjudicatory phase, the burden was on the state to show by preponderance of the evidence. And so, given that that occurred and the mother did bail the dad out and they were not divorced, certainly it doesn't appear he was in the home, but there was nothing... I know there was an order of protection, I believe, but there was nothing guaranteed that he would not be returned to the home or exposed to the child. How did the state not meet that very low burden that they had in that hearing? Your Honor, you are, of course, correct on all of those specific points. However, the requirement is a demonstration of a risk of harm to O.K. himself. At the time of the hearing, respondent father, Mr. Kennedy, had been bailed out. However, the record reflects that at no time after the magnitude of his crime was made apparent to Teresa, did she allow him back in. He was not allowed to return to the house by Teresa immediately following his bail or at any other time. There were court orders and also DCFS requirements that he not return. He was the source of the risk. He was no longer part of the household. And there is nothing in the record to suggest that that was likely to change or that Teresa had any inclination to do so. Was there a condition of bond that he had no contact or not being in the household? Your Honor, the record is not clear on that. However, there was at that point a requirement as part of the safety plan that the Department of Child and Family Services had implemented that he not have contact. It's worth noting that Teresa went one step further and prevented him, as far as she was able, from returning home at all and has since then absolutely prevented any contact between Mr. Kennedy and O.K. The requirement for applying the injurious standard theory is not merely that harm has been done, but that that harm presents a risk. The harm in this case, while unconscionable, occurred to a newborn in the household. By the time of this hearing, the household no longer contained the parent who was clearly the offending parent and there was only one child left in the household, the minor issue, O.K. himself. And O.K. appears to have been present when this happened to the other child, correct? Your Honor, the record is a little bit fuzzy. He was in the house. Whether he was present at the time of the injury is unclear. Well, would you agree that his presence in the house is a factor that should be considered? Your Honor, I would agree that his presence, that the fact that Mr. Kennedy had been the caretaker that day and was the caretaker for all the children, is a relevant factor. The fact that O.K. was in the house at the time of the incident is hard to tell because we don't know where he was. Now, O.K. did observe the attempt at resuscitation of his late foster sibling and no doubt that was traumatic. And the harm inflicted on a sibling by a parent can establish a prima facie case of neglect as to other children in the house. Whether or not the sibling witnessed the abuse? Correct, Your Honor. However, a prima facie case is not the end of the discussion. To look no further than that is to fall prey to the absolute corrective liability theory. In this case, there is uncontroverted evidence in the record of not only the ability of the parents to care for the children as attested to by family, friends at the time, and as certified by state agencies responsible for this quite shortly before the tragic incident. But at the time of the adjudicatory hearing, the circumstances had significantly changed. Counsel, are you trying to combine the adjudicatory and the dispositional phase? I mean, at the adjudicatory phase, we're just looking at the status of this child. We're not looking at him as a cause for blame. That's what we're considering. Yes, quite right, Your Honor. I'm sorry for interrupting. Yes, and the trial court was quite clear that that was the only decision that was being made at the adjudicatory hearing. Nonetheless, it's worth noting that findings at the adjudicatory hearing do carry forward, so the facts can be relevant moving onwards. The adjudicatory hearing only requires a finding of neglectedness as to the childhood issue, not neglectfulness of either parent. However, I would point out that that distinction has occasionally been made. The circuit court in the case of Inri S.S. did make that distinction, despite the fact that it's not required to, because in that case, like in this case, it was very clear which parent was the offending parent and which parent was not. Inri S.S., is that the one where the young woman had her boyfriend babysit him? So they weren't married. That's correct. They didn't live in the same household. That's correct. So a little bit different on the facts. Yes, Your Honor, it is. That's right. And the parallel to this case is that because it was clear that the remaining custodial parent, the mother, as in the case here, was a non-offending parent, that court found that it would have been appropriate to look beyond mere neglectedness of the child and assess neglectfulness. The trial court decided not to do this, as is its right. However, it was clear what the result would have been had the trial court opted to do so. By not doing that, the trial court applied the workaround of injurious environment. In a case which did not require that, there was a child that clearly and sadly had suffered abuse, but O.K., just as clearly, had not. At the dispositional hearing, several months later, the court moved on to the other findings. Having accepted that O.K. was neglected according to statutory provisions, the court then went on to address fitness of respondent mother, Teresa, and the removal question. The standard in both of those is a preponderance of evidence. In this case, evidence is not much of an issue. None of the witnesses' credibility was at issue. None of the essential facts were contested, and none of the documents had their authenticity put into doubt. The facts regarding unfitness and inability of the mother were scarce, shall we say. The state has the burden to demonstrate that, in this case, petitioner Teresa would have been an unfit parent. No evidence on this point was presented during the course of the trial. The court, in citing the reasons why it found Teresa unfit, mentioned a few. It mentions her psychiatric care, which, notably, she sought out of her own accord, which is a non-sequitur in this case. The trial court noted difficulty, excuse me, noted that Teresa had engaged in classes, again, of her own accord, recognizing the difficulty of the circumstances, which is not a criteria for unfitness. The court noted that respondent Mother Teresa had, in the court's word, made an admission of the difficulty of parenting, which, again, I would suggest is a sign of wisdom, not a sign of unfitness. And lastly, noted that there were some difficulties and behavioral problems at visitation and behavioral and disciplinary measures with O.K. Counsel, I really think this is the strongest argument at this position to use what should have been done. But I know that in looking at the CASA report, which I loved having CASA when I was doing juvenile cases because they didn't get in depth and they had a lot more time to spend on these cases. I thought the CASA report really caused the court some legitimate concern regarding the minor's behavior toward the mother. I mean, his physical aggression, which was beyond your usual frisky three-year-old. And so I'd like you to speak to that. I mean, why wasn't that enough? Your Honor, that was evidence that O.K. had and displayed some behavioral disorders. The visits observed by the CASA observer and noted in the report occurred during the, I believe it was, first four of the first seven visits, all of which occurred in the early days of this process. The CASA observer, Your Honor, did widely note concerns about behavior and control. However, it's worth noting that the other reports by CASA and by the department noted that O.K. also acted out during daycare and that he also acted out in the custody of his temporary foster caregiver, maternal grandmother, Ms. Roney. He was physically aggressive. Ms. Roney notes that he would strike her and throw things at her as well. So for the CASA, I show you respect for the advocate system. However, in this case, they observed early day visits, a limited number of them, and did not have the opportunity to observe the progression in O.K.'s behavior, which is noted in the larger DCFS report and attributes fault to Teresa for behavior that O.K., according to the record, displayed for all of his caregivers. Well, let me ask you this. As I recall the record, the CASA worker did not observe these same issues when that worker was at the visit at the grandmother's home. I know grandmother made some statements regarding the child's behavior, but I don't recall that they were personally observed by the CASA worker. And of course, grandma is the mother of the mother in this case. The other thing, I thought that the child did very well in daycare and did not have issues in daycare, is what I recall they occurred to be. So, I mean, I certainly don't want to stand corrected if I'm wrong, but that's my recollection. Your Honor, I believe the most recent DCFS report noted that daycare had reported some aggression, particularly on the day following visitations with mother. You're not still in this case, are you? Excuse me, Your Honor? At the circuit court level, you're not still in this case, are you, right now? Because I don't recall that at all. Your Honor, I'm afraid I can't point to the line page number at the moment. I don't doubt that your recollection of the record is accurate. That being said, the context of those visits, Your Honor, was the CASA observer observed okay at Ms. Rooney's house, where he had been temporarily residing on a full-time basis at that point for several months. The visits that the CASA observer observed with Teresa were at Teresa's house, which had been okay's primary residence, of course. However, at the time those observations were made, it was a place he got to go an hour a week. He was returned and reunited with his mother, an opportunity which you would expect to excite a three-year-old, and returned to the home that he knew and loved. I would suggest that it's reasonable for a child to be especially energetic and rambunctious in that case. Nonetheless, even taking the dimmest possible view of the circumstances as noted by the CASA report, difficulty controlling a three-year-old who has recently suffered trauma is not the standard for parental unfitness. If it were, heaven help any single parent or any family undergoing such tumultuous conditions. Unlike the body of law surrounding these theories, this family not only did not have any history of abuse, violence, or substance use, this family, including Teresa, had been repeatedly affirmed as fit to parent. If this family, in these circumstances, were found not to rise to the level of fitness, I would suggest it would create a precedent that would be difficult for any family to meet in future. The third issue addressed in the briefs was also brought up at the dispositional. It was the court's finding that removal was in the best interests of O.K. and selecting a remedy which required directly and immediately supervised visitation. Here is where we see the intellectual exercise of application of the injurious environment meet the road and miss, if I may, the forest for the trees. As we've discussed, there was quite a bit of trauma in O.K.'s young life, and this led to a number of difficulties that he manifested that have been noted by several places. To compound this by further separating him from Teresa makes the error originally taken out of an overabundance of caution not much worse. The record demonstrates commentary to the effect that O.K. cried himself to sleep, asked where his mother Teresa was, developed behavioral difficulties that caused struggles at the end of his visits and with all of his caregivers. The reasons cited by the trial court for the removal all stem from the difficulties that followed this. The other decision the trial court made to require directly supervised visitation is what made the situation go from bad to worse. None of the parties involved or the agencies recommended directly supervised visitation. That was a decision the trial court made, again, out of an overabundance of caution. However, the result was that not only was O.K. separated from one of his parents and both of his former foster siblings, but from his mother as well, to go from the house he knew and loved and the mother who he should by rights have been able to be with to only seeing her for one hour a week when such a result had not been recommended by either the agency or the department or the state involved was an abuse of discretion on the trial court's part. In conclusion, the separation that this caused continues each and every day that we're here. It was a case where a family suffered a one-time unforeseen trauma, and as a result, the life of O.K. has been totally turned upside down and continues to be. His fourth birthday is approaching. This is a formative age for a child. Each day he decides whether to develop a personality disorder or not, and being required to only be with his mother on such a limited basis is not a result that's warranted by the facts of the case. The maxim for these is that a court must look to the circumstances at issue and the facts at issue. Appellate suggests that that was not done in this case as well as it should have been, that the state did not meet its burden on several of the requisite findings along the way, and that the result that was chosen at the end was inappropriate. The problem overarching this case is that if this family is subject to absolute parental liability, then we set up a mechanical push-button system. Any significant injury to one child, as unforeseen or as unrepeated as it may be, could trigger this sort of family breakdown and these sort of unjust limitations on a parent who is essentially innocent of all problems, Teresa's sole crime here is being the breadwinner. The results of this separation are, in sum, egregious. For these and the foregoing reasons, the court should reverse the trial court's findings as to abuse or neglect of O.K., as to the unfitness and inability of Respondent Mother Teresa, and as to the removal of custody and guardianship from her and the limitation placed on visits subsequent to that. If there are no other questions, I'll take my seat. Thank you. Good morning, members. May it please the court, counsel. In this case, the trial court properly found that there was an injurious environment. The law is clear that the abuse or neglect of one child can be used to prove the neglect of another child. And I think that the trial court was properly concluding that there can be no more dangerous or injurious environment to a child than to live in a home in which another child has been beaten to death. On that point, and in follow-up to what Mr. Kennedy's counsel concluded, he essentially argues that, on the circumstances of this case, that particular finding essentially that is not against the manifest way in this case is an irrebuttable presumption of injurious environment. How does he find that? Well, it's not an irrebuttable presumption. It's just a question of facts for the trial court to determine. And the question is that determination of the trial court should be reversed only if the opposite conclusion is clearly apparent from the record. And I preface this with saying, given the circumstances in this case, that effectively it's an irrebuttable presumption. So what is it about the facts of this case that weigh in favor of finding an injurious environment beyond just strictly the fact that a sibling suffered abuse? Well, I think it's more than just abuse. If you have the death, then we have the question of, is this really a one-time thing? We don't know. The death is certainly a one-time thing. But is this the first and only time that Patrick, the father, had ever hit one of the children? We don't know at this stage of proceedings. I assume that there's no evidence that there was any abuse or any other allegation. But at the time of this particular hearing, as far as the adjudicatory stage, was it a one-time thing? Is the mother going to continue to keep the father out of the house? We have her saying she believes her husband as far as how the death occurred. We have the medical testimony that no way is it possible that the death could have occurred in any of the two or three ways Patrick claimed the death occurred. Then you have the circumstance that the mother bails him out of jail, which again raises questions, legitimate questions, the question to court, how much is the mother going to be willing to protect the child from the father in the long run, or how much does this say about how dangerous this environment is to this child? Is there evidence as to how long they have been married? I believe it's in the record, but I don't recall the exact time frame. I think they've been married for several years. What about the fact that this child is in the home when this occurred? Does that play into it? I think that definitely does play into it. This is not a case where a child who didn't be abused seven years before a murder, saying that because a child five years ago was hurt, this one is hurt. I think that there's a more clear and present danger involved when a child is killed in the home at the same time that this particular child is in the home and apparently was able to observe the resuscitation efforts. So I don't think that the trial court's decision as to the danger of the environment was against the manifesto of the weighting of the evidence or that the opposite conclusion is so apparent that his determination should be reversed. With regard to the trial court's finding of unfitness and decision to place the child with DCFS, the trial court below found that the respondent was both unfit and unable. In his original brief, the respondent only challenged the finding of unfitness. They made no challenge to the finding of an inability. So the finding of inability in and of itself, which has never been challenged before, is sufficient to support the trial court's decision. So any question as far as fitness is moot. The respondent has attempted in his reply brief to say, well, I meant both unfitness and inability since they're intertwined, but under Rule 341, you cannot raise a claim for the first time in a reply brief. What's the distinction between unable and unable? Well, unable can be things like you're in the hospital, you're in jail, you have some physical condition that prevents you from being able to take care of the child. The mother has just had a car accident and has a broken leg. They're unable to take care of the child because they simply can't get her out of the house. In this case, what were the limitations on the part of Ms. Kennedy that rendered her unable to state that she was being unfair? Well, I think the inability was her inability to control the child, even in the limitations of a temporary visit. If the child, the counselor, of course, stated that there was a real danger of injury to her, to the child, or to someone else because of the child's behavior, the report also said that the child was not having, you're correct, Justice White, my recollection of the record is that the OK was not having problems in school as far as this kind of egregious behavior, nor was the grandma having problems with this type of behavior. The very fact that the parent is unable to control a child or the danger of injury in a visit of this kind certainly supports the trial court's conclusion that at this time the respondent is unable to care for the child properly. You also have the fact that she admits herself that she needs counseling, she needs parenting help because she doesn't really know how to take care of a child because she was not a major part in the upbringing of the child before and did not want to take a big part before. Now she's suddenly thrust into the role of a single parent and by her own admission is unequipped. The fact that she's seeking help, I admit that's a positive. That is exactly what we want to see of parents in this situation and that is an indication that hey, OK, let's get the child and the parent the counseling and the help they need and in short order this child should be able to be returned. That is the goal is that OK, at this point in time there are certain problems and concerns regarding whether this mother can safely care for this child. Is it reasonable for the trial court to err on the side of caution? I think it is. This is not an easy case for any stretch of the imagination. It almost sounds like asking the trial court or this court to ignore the burden of proof. It sounds like you're saying this is pretty close. I'm not asking this court to ignore the burden of proof. I'm saying that the trial court applied the proper burden of proof to the evidence before him and that the decision as far as placement was not an abuse of discretion. That is the standard at the disposition hearing. His findings and facts were contrary to the manifest way of the evidence. The trial court's findings I don't believe fall within that rubric of against the manifest way of the evidence. This is a case where could the trial court have acted a little differently? Possibly, but that is not the standard. Nor is the standard what would this court, if you were the trial of facts, was the trial court's findings and facts contrary to the manifest way of the evidence and was his choice of disposition an abuse of discretion? The abuse of discretion standard is usually stated as being arbitrary or capricious or no reasonable person would take the view adopted by the trial court. And I think that even though this may be a close case, this is the type of case where this court should defer to the judgment of the trial court rather than trying to substitute its judgment to the trial court or re-weigh the evidence or say no, I think it should be weighed differently. I want to make one final thing. As far as the finding of fitness, in the original brief, respondents suggested that you cannot find someone fit at an original disposition hearing unless the adoption act grounds of fitness are present. A correspondent has seemingly abandoned that today in his reply brief, but I would simply submit that that is not the standard and should not be the standard. Counsel, what about the visitation issue? As I recall this record, the trial court did not set the visitation. That was set by the Department of Children and Family Services. Was that at their discretion? Yes, it was at their discretion, yes. But it's still supervised? At that point, I don't, at the point of the disposition hearing, correct. If there are no further questions. Seeing none, thank you, Mr. Kramer. Thank you, Your Honor. Mr. Kramer, do you have anything to follow? Your Honor, I do. May I have one minute to check the fact I have with me? Yes. Thank you. Thank you. May it please the Court. The arguments made by my esteemed counsel mirror the concerns of the trial court, that a child had died in the house. Nonetheless, the State still bears the burden of proving each element that is required along the way. A mere fear that future problems may arise is insufficient, absent evidence of that, and in the face of evidence contravening that assumption. The responses that we've heard today, as we've heard previously, are along the lines of, we do not know, or there is nothing in the record to suggest harm to O.K. himself. Your Honors, I suggest that that's tantamount to the absence of evidence, and in light of the contrary evidence, the various findings we've discussed today should be overturned. The question of bail was raised and discussed. I think that that is, in fact, the crux of the matter here. It's worth noting that the State did not begin any of these proceedings until after Theresa bailed out Mr. Kennedy. However, her actions thereafter have been steadfast and consistent. Despite the love that she felt for her husband of many years, she has placed the safety and her concerns for O.K. above and beyond that without doubt, and there has been no evidence to suggest that she has or would do otherwise. Understanding her situation at the time is important. At the time she bailed him out, she was not privy, of course, to the investigation of what was going on. All she had to base her beliefs on were the statements made to her by her husband. Nonetheless, she did not fall for it and prevented him from being around O.K. The other point I would like to raise relates to unfitness. Opposing counsel brings up the issue of inability. Some examples mentioned being in the hospital, being physically unable to move. Case law suggests being stuck in another state. However, the argument we hear relates to ability to parent, in other words, the unfitness side. The Juvenile Court Act, Section 227, requires that the factual basis for judicial findings be put in writing. If there were or had been any basis for inability, which I submit there were not, they must have been listed and they simply weren't. This is a discussion about unfitness and inability used synonymously, as they have been throughout this case. The only other point I wish to make is regarding Teresa's intentions. There was a comment made by Mr. Kennedy that at the time they began their family, she desired to be the breadwinner and he desired to be the stay-at-home parent. To impute that to any current motivations of Teresa, when her actions show her ongoing desire to be the best parent she can be, is likewise inappropriate. Because of the failings of the state to meet its burden on these points, Your Honors, we resubmit our request for overturning those decisions at the trial level. Thank you for raising that, Your Honor. In the verdict rendered orally and as referenced in the written decision, the trial court left discretion to DCFS, however, limited visitation to directly and immediately supervised. In effect, that requires DCFS or an approved agency to attend. The result is one hour a week of contact between a child in need and an innocent mother. That was the abuse of discretion that we cite and that we wish to have overturned. Thank you, Mr. Kramer. Thank you, Your Honors. The case is submitted. The court will stand and reset.